Jerry W. **WYRICK,** Plaintiff,

v.

Kenneth S. **APFEL,**[1] Commissioner of Social Security, Defendant.

No. 2:96CV01021.

United States District Court, M.D. North Carolina, Greensboro Division.

March 30, 1998.

---

**1.** Kenneth S. Apfel was sworn in as Commissioner of Social Security on September 29, 1997. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel should be substituted for Acting Commissioner John J. Callahan as the defendant in this suit. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Marilyn Lee Allen, Greensboro, NC, for plaintiff.

Gill P. Beck, Office of U.S. Atty., Greensboro, NC, Regional Counsel, Commissioner of SSA, Atlanta, GA, for defendant.

## ORDER

TILLEY, District Judge.

On February 2, 1998, in accordance with 28 U.S.C. § 646(b), the Recommendation of the United States Magistrate Judge was filed and served on the parties in this action and a copy was given to the court.

Within the time limitation set forth in the statute, counsel for the Plaintiff objected to the Recommendation.

The court has appropriately reviewed the portions of the Magistrate Judge's report to which objection was made and has made a de novo determination which is in accord with the Magistrate Judge's report. The court therefore adopts the Magistrate Judge's Recommendation.

**IT IS THEREFORE ORDERED** that the Plaintiff's motion for judgment [document # 13] be **DENIED,** that the Commissioner's motion for judgment [document # 15] be **GRANTED,** that the Commissioner's decision be **AFFIRMED,** and that this action be dismissed. A Judgment dismissing this action will be entered contemporaneously with this Order.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

SHARP, United States Magistrate Judge.

Plaintiff Jerry W. Wyrick seeks judicial review, pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying his claim for a period of disability and disability insurance benefits. The Commissioner's denial decision became final on October 15, 1996, when the Appeals Council found no basis for review of the hearing decision of the Administrative Law Judge ("ALJ"). In this action, both parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

### The Claimant

Plaintiff was born on May 23, 1941, and was 49 years of age on his alleged onset date of disability. He finished the eleventh grade and has past relevant work as a maintenance supervisor, self-employed landscaper and dishwasher installer. Plaintiff alleges disability as of May 23, 1990 due to coronary artery disease, peripheral vascular disease, diabetes mellitus, chronic obstructive pulmonary disease and depression. His disability insured status expired on March 31, 1991.

### The Administrative Procedure

Plaintiff applied for benefits on October 19, 1993, alleging disability as of May 23, 1990. The claim was denied initially and on reconsideration. A hearing before an ALJ was held on July 27, 1994, and a decision denying benefits was issued on October 11, 1995. Plaintiff filed a request for review of the ALJ's decision, and the Appeals Council subsequently found no basis for review. The findings of the ALJ relevant to this review include the following:

1. Plaintiff met the disability insured status requirements of the Act on May 23, 1990, and continued to meet them until March 31, 1991, when his disability insured status expired.

2. Plaintiff has not engaged in substantial gainful activity since May 23, 1990, the alleged onset date of disability.

3. The medical evidence establishes that Plaintiff has impairments which are "severe" within the meaning of the regulations consisting of residual coronary artery disease, chest wall discomfort from surgery, vascular disease of the legs, diabetes, and chronic obstructive pulmonary disease.

4. Plaintiff has suffered no mental or physical impairment, or combination of impairments, which meets or equals the level of severity specified in Appendix 1, Subpart P, Regulations Number 4.

5. Plaintiff's testimony at the hearing was not fully persuasive.

6. Plaintiff has the residual functional capacity to perform "sedentary" and "light" work activity with the following restrictions: standing or walking not to exceed four hours a day, no exposure to dust, fumes, smoke, or temperature extremes, and no work at unprotected heights.

7. The vocational expert testified that with a residual functional capacity for "sedentary" and "light" work activity, and the restrictions listed above, Plaintiff could perform "semi-skilled" and "unskilled" occupations at the "light" and "sedentary" exertional levels.

8. Based on Plaintiff's vocational profile and the testimony of the vocational expert, the framework of Rules 201.10 and 202.19 of the Medical–Vocational Guidelines in Appendix 2 to Subpart P of Social Security Regulations Number 4 provides a finding of "not disabled."

9. Plaintiff was not disabled at any time through March 31, 1991.

### The Scope of Review

The scope of judicial review by this court of the Commissioner's decision denying benefits is limited. *Frady v. Harris,* 646 F.2d, 143, 144 (4th Cir.1981). The court must review the entire record to determine whether the Commissioner has applied the correct legal standards and whether the Commissioner's findings are supported by substantial evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990). Where this is so, the Commissioner's findings are conclusive. The court may not reweigh conflicting evidence

that is substantial in nature and may not try the case *de novo.* *Id.* Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citations omitted), or "evidence which ... consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Shively v. Heckler,* 739 F.2d 987, 989 (4th Cir.1984) (citations omitted).

### Summary of the Evidence

In mid May of 1990, Plaintiff began to experience pain in his chest. A visit to Dr. Robert N. Koehler revealed significant ST segment depression in leads I, II, AVL, and Z to about 3 mm. Plaintiff was given NTG spray and referred to Moses H. Cone Memorial Hospital. (Tr. at 133) On May 22, 1990, Plaintiff underwent a vascular diagnostic test which showed that his left femoral arterial flow was abnormal. (Tr. at 176) Cardiac catheterization was performed on May 22, 1990, which revealed coronary artery disease in four arteries. (Tr. at 139) Coronary artery bypass graft times four was performed on May 23, 1990. (Tr. at 141–143) Upon discharge, Plaintiff's surgeon, Dr. Charles Wilson, advised Plaintiff to limit himself to light to moderate activity, no lifting over ten pounds, and no driving or strenuous activity. (Tr. at 173)

Plaintiff was seen by Dr. Wilson for a routine follow-up visit on June 21, 1990. Dr. Wilson reported that Plaintiff had "got along very well" postoperatively and had no complaints. Dr. Wilson felt Plaintiff had gotten an "excellent initial result from his coronary artery bypass surgery," and discharged him back to the care of his regular physician. (Tr. at 174)

Plaintiff was seen on June 26, 1990 by Dr. Jerome Ruskin. Dr. Ruskin noted that Plaintiff had "done well" since surgery and that his scars were well healed. Dr. Ruskin observed some chest soreness in the surgical wounds and some right ankle swelling. He recommended a cardiac rehabilitation program, but Plaintiff did not appear to be interested. (Tr. at 177)

Plaintiff underwent a treadmill stress test on July 10, 1990, but the test had to be terminated due to bilateral leg cramps. Again, Dr. Ruskin urged Plaintiff to go to a cardiac rehabilitation program, but Plaintiff was "disinclined to do so." (Tr. at 178) Plaintiff attended a diet consultation on August 21, 1990 in order to better control both his diabetes and high cholesterol. The dietitian set his target weight at 170 pounds (Plaintiff at that time weighed 186 pounds), and prescribed a low-fat diet. (Tr. at 179)

On September 11, 1990, Plaintiff did not show up for his scheduled diet consultation, and by the 28th of September, Dr. Ruskin urged Plaintiff to lose twenty pounds. (Tr. at 179) By November 27, 1990, Plaintiff's weight had increased to 195 pounds, and he was prescribed Questran Lyte to reduce his cholesterol. (Tr. at 180) By mid January, Plaintiff's blood pressure had increased to 170/100, and he had gained five more pounds. Id. Dr. Ruskin once again asked Plaintiff to "vigorously attempt to lose weight." Id.

On June 10, 1991, Plaintiff had an annual physical examination. The visit revealed that he had trace peripheral edema and slight claudication in the left lower extremity, but good general health. Dr. Ruskin also reported that Plaintiff had not been following his diet carefully. (Tr. at 183) Two weeks later, Plaintiff was started on Diabeta to lower his blood sugar and was scheduled to see the dietitian. (Tr. at 184) By July 16, 1991, Plaintiff had still not seen the dietitian, and his weight had increased to 202 pounds. (Tr. at 185) At doctor's visits on August 1, 1991 and September 5, 1991, respectively, Plaintiff reported that he was feeling fine and that his leg was a little better. (Tr. at 185–186)

Plaintiff was not seen again until December 9, 1991. By that time, his weight had jumped to 215 pounds, and he was placed on Trental for his leg pain. (Tr. at 186) On December 31, 1991, Plaintiff was switched from Questran Lyte to Mevacor; Plaintiff promised Dr. Ruskin that he would be on a diet and lose some weight. (Tr. at 187)

Plaintiff was seen again for his annual physical examination on June 17, 1992. Dr. Ruskin reported trace ankle edema, and general good health. (Tr. at 189–190) He again noted that Plaintiff does not follow his diet too well. (Tr. at 189) He recommended Plaintiff undergo an abdominal aortogram and bilateral femoral arteriograms, and felt Plaintiff was a possible candidate for angioplasty. (Tr. at 190) On June 22, 1992, Plaintiff underwent these tests, which showed marked arteriosclerotic change in the left common iliac with several lesions estimated at fifty percent with one stenotic segment estimated at eighty percent. (Tr. at 191) An ABI on July 1, 1992 revealed that Plaintiff's segmental pressures and waveforms on the left are indicative of proximal arterial occlusive disease. (Tr. at 192)

In light of these test results, Plaintiff underwent left iliac angioplasty on July 17, 1992. (Tr. at 193–194) Following the surgery, Plaintiff was reported to have "excellent angiographic result and improvement in pulses." (Tr. at 194) Another ABI performed on July 23, 1992 showed normal ABI's and waveforms. (Tr. at 195)

Plaintiff was not seen again for nearly a year. On June 4, 1993, Plaintiff's weight was 213, and he reported "not feeling very well" and some chest wall pain. Dr. Ruskin noted "trace at best ankle edema," and that the angioplasty had relieved the claudication in his leg. On June 18, 1993, Plaintiff was still not feeling any better, although his laboratory work was essentially normal. His blood sugar was 180, which Dr. Ruskin felt was the best it had been. Dr. Ruskin felt that Plaintiff was "probably somewhat depressed," and attributed some of his symptoms to this depression. In response to Plaintiff's claim that he could not work as a landscaper any longer, Dr. Ruskin wrote that he was not "sure why he is finding it difficult to operate his equipment." Plaintiff was started on the anti-depressant, Zoloft. (Tr. at 196) A July 13, 1993 echocardiogram was normal. (Tr. at 197–198)

On August 20, 1993, Plaintiff was still not doing well, and continued to insist he could not work. Plaintiff reported that he got nauseated and "white as a sheet" when he tried to repair a pool liner. He additionally reported mild leg symptoms not like his earlier claudication. Dr. Ruskin was "at a loss to explain why he is feeling so badly." (Tr.

at 200) A September 1, 1993 laboratory test revealed that Plaintiff's cholesterol was well controlled by his medication but that his blood sugar remained high. (Tr. at 199) Dr. Ruskin wondered if Plaintiff's problems could be related to his diabetes and his peripheral vascular disease, and recommended Plaintiff return for more testing. (Tr. at 200) After a phone call by Plaintiff to the office on September 28, 1993 for refill of a prescription, Dr. Ruskin did not have contact with Plaintiff again. (Tr. at 200, 213)

On June 30, 1994, in response to a letter from Plaintiff's attorney, Dr. Ruskin explained why he had no further medical records for Plaintiff after September of 1993. Dr. Ruskin wrote, "[i]n summary, Mr. Wyrick's symptoms and limitations of work capacity were greater than I could explain on the basis of his physical findings. Further evaluation has not been carried out, I believe primarily because Mr. Wyrick felt that he could not afford to do so." (Tr. at 213)

### Discussion

In this action for judicial review, Plaintiff contends that (1) the ALJ's use of Plaintiff's financial inability to obtain ongoing medical treatment to support a finding that Plaintiff did not have a disability is error of law, (2) the ALJ's conclusion that Plaintiff retained the residual functional capacity for light and sedentary work is not based on substantial evidence, (3) the opinion of the vocational expert that significant jobs exist for which Plaintiff is qualified is not supported by substantial evidence, and (4) the ALJ's formal finding that Plaintiff is 49 years of age at his alleged onset date of disability and was in the "younger individual" age category is erroneous.

In reaching a decision on Plaintiff's claim, the ALJ followed a five-step analysis set out in the Commissioner's regulations. 20 C.F.R. § 404.1520 (1996). Under the regulations, the ALJ is to consider whether a claimant (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. The burden of persuasion is on the claimant through the fourth step. *See Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir.1992). If the

claimant reaches the fifth step, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform considering his age, education and work experience. *Id.*

At the first step in the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. At the second and third steps, the ALJ found that Plaintiff had severe impairments consisting of residual coronary artery disease, diabetes mellitus, chronic obstructive pulmonary disease, peripheral vascular disease and chest wall pain from surgery, but that these impairments, either individually or in combination, did not meet or equal a listing in Appendix 1, Subpart P, Regulations Number 4. At the fourth step, the ALJ determined that Plaintiff retained the residual functional capacity to perform light and sedentary work that did not involve walking or standing more than four hours in a day, or exposure to dust, fumes, extremes in temperature or unprotected heights. This residual functional capacity precluded Plaintiff from performing any of his past relevant work. Therefore, the burden shifted to the Commissioner to show that Plaintiff was nonetheless capable of performing work that exists in the national economy. A vocational expert was called, and testified that Plaintiff was capable of performing semi-skilled and unskilled work at the light and sedentary levels. Thus, the ALJ found that Plaintiff was not disabled.

■ Plaintiff first contends that the ALJ improperly considered Plaintiff's financial inability to obtain ongoing medical treatment in his evaluation of Plaintiff's residual functional capacity. The ALJ observed that Plaintiff failed to follow through with "recommended therapy which may have alleviated his complaints." (Tr. at 19) The ALJ further found that Plaintiff could afford medication and could have afforded the "small additional charges for more optimal medical care." *Id.* Plaintiff contends that he could not afford to receive treatment because his insurance deductible was $1,500, and therefore, the ALJ could not use his failure to follow his physi-

cian's recommendations as part of his decision rationale.

First, it is important to note that Plaintiffs apparent financial inability to afford medical treatment did not arise until approximately September of 1993, when Plaintiff stopped going to Dr. Ruskin for treatment. (Tr. at 200, 213) Prior to that time, and during the entire time period relevant to this case, Plaintiff attended his doctor's appointments regularly, filled all of his prescriptions, underwent frequent laboratory testing, and even had surgical procedures performed. (Tr. at 177–200) No mention was made to any physician until the end of September of 1993 that Plaintiff was facing financial inability to continue his treatment. (Tr. at 200, 213) Thus, when the ALJ stated in his decision that Plaintiff failed to follow prescribed treatment which could have alleviated his symptoms, at least until September of 1993, he was not referring to Plaintiff's financial troubles. (Tr. at 19) Rather, he was referring to Plaintiff's unwillingness to enter a cardiac rehabilitation program despite Dr. Ruskin's urging (Tr. at 177–178), to Plaintiff's not showing up at the dietitian on two occasions (Tr. at 179, 185), to Plaintiff's refusal to restrict his diet to watch his sugar and fat intake, and to Plaintiffs thirty pound weight gain when he was instructed to lose twenty. (Tr. at 179–185, 189) The regulations require a claimant to follow prescribed treatment if the treatment can restore the claimants ability to work, unless the claimant offers an acceptable reason for noncompliance. 20 C.F.R. § 404.1530 (1996). Plaintiff has offered no justifiable reason why he failed to follow any of these prescribed treatments. Therefore, it was not error for the ALJ to use this failure in his assessment of Plaintiff's residual functional capacity.

In his reply brief, Plaintiff argues that this failure to follow treatment pertains only to Plaintiff's heart problems and diabetes, and not to his leg claudication, which is the "primary impairment upon which he based his claim for disability." Thus, Plaintiff claims he has shown he did all he could to treat his leg problem up until September of 1993, when he could no longer afford treatment. Plaintiff's argument fails for two reasons. First, it is not at all clear that Plaintiff's leg claudication is the primary condition on which he based his claim for disability. On his Disability Report dated October 19, 1993, Plaintiff lists the following conditions as disabling: "heart condition, diabetes, high cholesterol, clogged veins in legs." (Tr. at 109) On his Reconsideration Disability Report, Plaintiff lists depression and "right shoulder pain and limited ROM" as additional disabling conditions. (Tr. at 117) His alleged onset date of disability is the date of his coronary artery bypass graft, not the date of the vascular test revealing abnormal femoral artery flow. The vast majority of evidence submitted pertains to his heart condition, high cholesterol and elevated blood sugars. It was not until December of 1991 that his leg claudication became a prominent part of his medical treatment, many months after his date last insured. (Tr. at 186–195)

Second, even if Plaintiff's leg claudication were the primary condition on which he based his disability claim, he does not attempt to argue that this problem is disabling in and of itself. In other words, Plaintiff still must rely on his other conditions, taken in combination with his leg problems, to render him disabled. Thus, it is still highly relevant whether Plaintiff followed his prescribed treatments with respect to these allegedly "secondary" impairments. And therefore, Plaintiff's consistent failure to stick to his prescribed diet and pursue other treatments may properly be considered in assessing his residual functional capacity.

■ In contrast to Plaintiff's unwillingness to follow Dr. Ruskin's advice, Plaintiff's failure to follow prescribed treatment after September of 1993 due to financial inability would involve different considerations. Under Social Security Ruling 82–59: *Titles II and XVI: Failure to Follow Prescribed Treatment*, inability to pay is considered a justifiable reason for refusal to follow prescribed treatment. However, SSR 82–59 was intended to cover situations where a claimant's condition is actually disabling under the regulations, but the claimant is denied benefits or his benefits are terminated because he refuses to follow treatment that could restore his ability to work. Clearly, when a claimant has proven he has a *disabling* condition, the standards under which the Social Security Administration can deny him benefits should be strict. In this case, however, the ALJ did

not find Plaintiff's condition disabling. Thus, we are not dealing with a case in which failure to follow prescribed treatment bars an otherwise successful disability claim.

While SSR 82–59 is not directly applicable to the case at bar, its underlying policies are of some guidance. Essentially, the ruling stresses that a claimant should be made aware, *before a determination is made*, that the Social Security Administration believes he does not have a good reason for failing to follow prescribed treatment and the likely effect on benefits. The claimant must be afforded the opportunity to undergo the treatment or show justifiable cause for failing to do so. Here, the ALJ clearly discounted Plaintiff's claim of "poor finances" without any evidence to the contrary and without affording Plaintiff the chance to document his financial condition. (Tr. at 19) There appears to be no evidentiary basis in the record for the statement that Plaintiff "could afford the small additional charges for more optimal care." *Id.* If Plaintiff had been made aware at the hearing that his failure to follow prescribed treatment could be a factor in denying him benefits, he could have provided any available documentation of his finances.

While the ALJ may have committed error in his consideration of Plaintiff's finances after September of 1993, it is clear that the error played no role in the decision under review. First, there is substantial evidence in the record to support the ALJ's residual functional capacity determination apart from his consideration of Plaintiff's finances. The ALJ placed considerable reliance on the Plaintiff's excellent recovery after his bypass and angioplasty, his reported daily activities, his unwillingness to follow recommended treatment *before* September of 1993, and the testimony of a medical expert in reaching his conclusions. Second, the time period of any error, from September of 1993 onward, is not critical to Plaintiff, whose alleged onset date of disability is May 23, 1990 and whose date last insured is March 31, 1991. Consideration of Plaintiff's medical record two and a half years after the date last insured did not contribute to the ALJ's decision in any significant way. Therefore, the Court does not find any error of law in the ALJ's discussion of Plaintiff's inability to pay for medical treatment.

■ Plaintiff next claims that the ALJ's conclusion that Plaintiff retained the residual functional capacity for light and sedentary work is not based on substantial evidence. More specifically, Plaintiff claims that he has had significant difficulty with leg claudication since his onset date, and therefore, that he would be unable to do light work, which involves substantial amounts of standing and walking. However, the record does not demonstrate that Plaintiff's leg problems limited him to a greater extent than that expressed in the residual functional capacity found by the ALJ. It is clear that the ALJ did take Plaintiff's leg problems into account. First, he included peripheral vascular disease among Plaintiff's severe impairments. Second, Plaintiff's residual functional capacity includes the limitation that he not stand or walk for more than four hours in a day. This limitation on Plaintiff's ability to perform light work effectively addressed the Plaintiff's leg problems at his date last insured. Therefore, this Court finds that the ALJ's residual functional capacity determination is supported by substantial evidence.

■ Next, Plaintiff argues that the vocational expert's opinion that significant jobs exist for which Plaintiff is qualified is not supported by substantial evidence. As Plaintiff was found to have nonexertional impairments that precluded the use of the Medical–Vocational Guidelines as the definitive basis for deciding Plaintiff's case, the ALJ called Dr. White to provide testimony about the existence of other work. *See* 20 C.F.R. § 404.1566(e) (1996); *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir.1989) (requiring vocational expert where Medical–Vocational Guidelines do not direct a finding). The vocational expert found Plaintiff's past work to be "at a very high level" which enabled him to develop a "very broad range of skills." (Tr. at 63) Plaintiff's maintenance supervisor position, in particular, had given Plaintiff "occupationally significant skills" such as: planning and directing the work of others; the technical details of maintenance work; working with different kinds of people in a variety of settings; decision making that would affect the work activities, the cost and the safety of others; the use of charts, maps, blueprints and plans; the use of numbers to

plan budgets and report results; the language to record and report both orally and in writing plans and progress, and to requisition tools, equipment and supplies; protecting, maintaining and upgrading masonry, woodwork, furnishings and utility systems in buildings; and inspecting and examining work to assure conformity to good standards. (Tr. at 62–63)

Plaintiff argues that the vocational expert's conclusion that Plaintiff's job as a maintenance supervisor provided him with many transferable skills was erroneous for three reasons. First, Plaintiff claims that the vocational expert did not have enough information about the position to determine the skills involved in performing it. However, Plaintiff has given adequate descriptions of the responsibilities of his job in three places in the record. First, on his Disability Report dated October 19, 1993, Plaintiff wrote that he supervised one to two people when he worked in maintenance and that he wrote work reports. (Tr. at 113) Second, on his Vocational Report dated October 25, 1993, Plaintiff indicated that his job duties involved using hand tools, such as saws, drills and hammers and supervising subcontractors to do repairs on the restaurant. (Tr. at 125)

Finally, Plaintiff testified at the hearing that he worked as a maintenance supervisor for a year and a half, and that he went around hiring people to do the repair jobs, and arranged where they worked. He testified that he also did some of the work himself. (Tr. at 36–37) Later in the hearing, Plaintiff testified that he actually did some of the work every week, and that such work included tearing out counter tops, putting in new ovens, and repairing the ceilings and the bathrooms and "stuff like that." (Tr. at 51–52) Thus, this Court finds that the vocational expert had more than adequate information about Plaintiff's maintenance supervisor position to determine what skills were involved in performing it.

Second, Plaintiff claims that it was error for the vocational expert to conclude that Plaintiff acquired skills at his job as a maintenance supervisor at the Specific Vocational Preparation ("SVP") level of 7. In order to acquire skills at SVP 7, the person must have performed the job for over two years. As Plaintiff only worked as a maintenance su-

pervisor for one and a half years, he could not have acquired skills at an SVP of 7. Plaintiff's argument overlooks two important points. First, according to the Social Security Plus exhibit appended to Plaintiff's reply brief, the definition of Specific Vocational Preparation is the "amount of lapsed time required *by a typical worker* to learn the techniques, acquire the information, and develop the facility needed for *average* performance in a specific job-worker situation" (emphasis added). The inclusion of the words "by a typical worker" and "average" performance indicate that the length of time assigned to each SVP is not meant to be absolute. Plaintiff worked one and a half years as a maintenance supervisor. While he may not have worked the full requisite two years for an SVP 7, he certainly had enough time to master most of the skills at that level. Second, even if Plaintiff did not have time to acquire all of the skills of his SVP 7 job as a maintenance supervisor, all of the jobs cited by the vocational expert are at SVP 5 or below. Therefore, if Plaintiff has the virtual capability to handle a job with an SVP of 7, then he has the ability to learn jobs with an SVP of 5 or lower.

Plaintiff's last argument is that any skills he may have learned while a maintenance supervisor are specific to that industry and would not readily transfer to the types of jobs the vocational expert cited, especially the clerical jobs. According to the regulations:

"[The Commissioner] consider[s] you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities [the claimant] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

. . .

Transferability is most probable and meaningful among jobs in which—

(i) The same or a lesser degree of skill is required;

(ii) The same or similar tools and machines are used; and

(iii) The same or similar raw materials, products, processes, or services are involved.

. . .

There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs. A complete similarity of all three factors is not necessary for transferability. However, when skills are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings, [the Commissioner] consider[s] that they are not transferable." 20 C.F.R. § 404.1568(d)(1)–(3) (1996).

Contrary to Plaintiff's assertion, the skills identified by the vocational expert as transferable are not industry-specific. These skills are not tied to a specific industry like mining, agriculture or fishing, and would be useful to Plaintiff in a number of work settings. *See Ingle v. Heckler,* 763 F.2d 169, 170 (4th Cir.1985) (abilities identified by vocational expert such as record keeping, use of firefighting machinery and tools, and responding to emergency situations were transferable skills); *Clemmons v. Bowen,* 856 F.2d 186, 1988 WL 86657 (4th Cir.1988) (unpublished opinion) (skills acquired as a maintenance supervisor were transferable to clerk positions at the light and sedentary level). Therefore, this Court finds no error in the vocational expert's conclusion that Plaintiff's skills as a maintenance worker would transfer to clerical jobs at the light level of work. Accordingly, this Court finds that the opinion of the vocational expert that significant jobs exist in the national economy for which Plaintiff is qualified is supported by substantial evidence.[2]

*Conclusion*

**IT IS THEREFORE RECOMMENDED** that the decision of the ALJ be affirmed. February 2, 1998.

---

2. Since this Court has determined that the ALJ's findings that Plaintiff can perform light work and has transferable skills are correct, Plaintiff's last argument on appeal is not discussed, as it is moot. Only if Plaintiff has no transferable skills and is limited to sedentary work does his age affect his categorization in the Medical–Vocational Guidelines.