**Daniel J. PHILLIPS, Plaintiff**

v.

**Jo Anne B. BARNHART Commissioner of the Social, Security Administration, Defendant**

**No. Civ.A.05–30147 KPN.**

United States District Court, D. Massachusetts.

Feb. 28, 2006.

Ronald B. Eskin, Law Office of Robert B. Eskin, PC, Lowell, MA, for Plaintiff.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Defendant.

## *MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFF'S MOTION TO REMAND OR REVERSE THE DECISION OF THE COMMISSIONER and THE COMMISSIONER'S CROSS MOTION TO AFFIRM HER DECISION (Document Nos. 12 and 14)*

NEIMAN, United States Magistrate Judge.

This matter is before the court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) which provide for judicial review of a final decision by the Commissioner of the Social Security Administration (the "Commissioner"), regarding an individual's entitlement to Supplemental Security Income ("SSI") and Social Security Disability Insurance ("SSDI") benefits. Daniel J. Phillips ("Plaintiff") claims that the Commissioner's decision denying him benefits—memorialized in a January 28, 2005 decision by an administrative law judge—is not supported by substantial evidence and is predicated on errors of law, in particular, that his credibility was improperly evaluated. Plaintiff has moved to reverse the decision or remand the matter for further review and the Commissioner, in turn, has moved to affirm.

With the parties' consent, this matter has been assigned to the undersigned pursuant to 28 U.S.C. § 636(c) for all purposes, including entry of judgment. For the reasons set forth below, Plaintiff's motion will be allowed, to the extent it seeks a remand, while the Commissioner's motion to affirm will be denied.

## I. STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991) (citation and internal quotation marks omitted). A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir.1996). In the end, the court maintains the power, in appropriate circumstances, "to enter . . . a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand[ ] the cause for a rehearing." 42 U.S.C. § 405(g).

## II. BACKGROUND

Plaintiff was born on May 11, 1973. He is a high school graduate and has worked as a laborer, forklift operator, maintenance worker, molder, auto body worker and order picker. (Administrative Record ("A.R.") at 15–16, 87, 237–44.) Plaintiff's application for benefits alleges disability due to pain and numbness in his back and legs, hand weakness, and obesity. (A.R. at 81.) Before turning to that application,

and the procedural history which followed, the court first summarizes some of Plaintiff's lengthy medical history.

## A. MEDICAL HISTORY

On March 30, 2000, Plaintiff was treated at the Franklin Medical Center emergency room for a back injury which occurred when he lifted a fifty-pound board at work. The emergency room doctors diagnosed Plaintiff with back strain and sent him home with prescriptions for Demerol and Phenergan. (A.R. at 126.)

On April 10, 2000, Plaintiff was seen by Dr. Arken Rehman of Hampshire Orthopedics for an evaluation of his lower back. Plaintiff described a constant pain which registered between "7" and "8" on a scale of 1–10, down from an initial "10" when first injured. Plaintiff described the pain in his back, spine and hips and stated that it got worse when sitting, lying down or bending. Dr. Rehman diagnosed severe sacrolitis on the right with sacroiliac joint dysfunction and prescribed medication, including Relafen, Flexeril and Vicoden, as well as a course of physical therapy. (A.R. at 182–83.)

On April 27, 2000, Plaintiff saw Dr. Rehman a second time. Although Plaintiff was feeling significantly improved, Dr. Rehman's overall impression was that Plaintiff was suffering from sacrolitis bilaterally, on the right side more than the left, with a possible small herniated disc with radiculitis. He advised Plaintiff to continue physical therapy and limited him to lifting fifteen pounds and light duty work with rare bending or twisting. (A.R. at 184, 190.)

On May 16, 2000, Plaintiff met with Dr. Rehman again and reported that he had pain radiating down his legs and felt weaker. Dr. Rehman prescribed additional physical therapy, Vicoden for pain, and ordered a magnetic resonance imaging ("MRI") study. The MRI showed a broad-based disc bulge and central disc protrusion. (A.R. at 185, 187.)

On July 6, 2000, Plaintiff met with Dr. Rehman for a fourth and final time. Plaintiff had gained weight and continued to complain of back pain radiating down his left leg with numbness and tingling in his lower legs. Dr. Rehman renewed Plaintiff's prescriptions, "told him to try to lose weight" and advised that he discontinue working until further notice. Dr. Rehman also ordered that Plaintiff's MRI be reviewed by a neurosurgeon to determine if he had disrupted or herniated a disc. (A.R. at 188, 191.)

On October 11, 2000, Plaintiff was seen by Dr. Richard Anderson, a neurosurgeon. At the time, Plaintiff had been taking Hydrocodone and Relafen, but had discontinued them after they helped less and less. Dr. Anderson observed, among other things, that Plaintiff was obese and in mild distress and that he had a limited range of motion. Dr. Anderson also reviewed the MRI and noted a broad-based disc bulge with decreased signal intensity consistent with disc dessication. He referred Plaintiff to Dr. Brett Hynninen at Pioneer Spine & Sports Physicians ("PSSP") for evaluation and epidural injections and prescribed Arthrotec and Tegretol for numbness. (A.R. at 173–74.)

On December 21, 2000, Dr. Hynninen evaluated Plaintiff. He noted that Plaintiff did not appear to be in any apparent distress when sitting in the examination room. Plaintiff reported lower back pain and right leg numbness when sitting or standing and stated that walking lessened the numbness. He also told Dr. Hynninen that he no longer took his medication because of their side-effects and limited effectiveness. Dr. Hynninen reviewed Plaintiff's MRI and diagnosed Plaintiff as

having right lumbar radiculopathy, probably at the L–5 level, and recommended epidural injections. (A.R. at 210–11.)

On May 9, 2001, Plaintiff received an epidural injection but experienced no significant improvement. One month later, on June 8, 2001, Plaintiff complained to Dr. Hynninen of numbness in his right leg when sitting or standing for prolonged periods, as well as back and leg pain. Plaintiff also described "periodic bouts of sharp, stabbing pain across his low back bilaterally." Dr. Hynninen felt that Plaintiff's initial attempts at physical therapy had exacerbated his symptoms and recommended a different course of physical therapy, an electromyogram ("EMG") and nerve conduction studies. (A.R. at 208–09, 217.)

Plaintiff continued monthly visits with Dr. Hynninen through September of 2001 and reported only mild improvement. Dr. Hynninen found that, throughout the visits, Plaintiff was in no apparent distress, had good range of motion, only mild tenderness to palpation and no pain on straight leg raises. On one of those visits, June 26, 2001, Dr. Hynninen indicated that he would recommend job retraining if Plaintiff did not improve with physical therapy. (A.R.204–08, 215.)

In January of 2002, Plaintiff underwent a discogram. According to a subsequent progress note, the discogram revealed that Plaintiff's L4–L5 and L5–1 discs were "significant typical pain generators," in the range of "10" out of "10" for his L4–5 disc and "8" out of "10" for his L5–S1 disc. (A.R. at 201, 212.)

In June of 2002, Plaintiff returned to Dr. Anderson. In the twenty-seven months since his initial injury, Plaintiff had gained approximately seventy-five pounds and was smoking two packs of cigarettes per day. Although Plaintiff had nearly a full range of motion with slight pain on extension, Dr. Anderson recommended a lumbar spinal Computerized Tomography ("CT") scan. He also opined that Plaintiff needed "to consider an aggressive weight loss program" and suggested gastric stapling as a possibility. (A.R. at 172.)

On October 15, 2002, Plaintiff reported to Dr. Anderson that Ultracet helped his pain, but that he did not want to get addicted to drugs. Plaintiff also acknowledged that "he needs to lose some weight, but has no idea how to do that." After examining Plaintiff and reviewing the CT scan, Dr. Anderson opined that Plaintiff needed a lumbar fusion but that it could not be performed unless he lost weight and quit smoking. Dr. Anderson referred Plaintiff to the pain clinic at Mercy Hospital for further evaluation and treatment. (A.R. at 171.)

On October 28, 2002, Dr. Ronald Paasch, another PSSP physician, reported that Plaintiff had lower back pain with occasional right lower extremity complaints and pain. Dr. Paasch opined that Plaintiff could not return to his regular work and that his treatment options were a surgical procedure known as Intradiscal Electrothermal Therapy ("IDET"), surgical intervention or pain management. (A.R. at 200.)

On November 12, 2003, Plaintiff sought treatment from Dr. William Levine at the Community Health Center of Franklin County. Dr. Levine noted that Plaintiff had gained more than two hundred pounds in the previous three years. He made note of Plaintiff's complaints of intermittent right thigh numbness and pain and opined that Plaintiff was morbidly obese with lower back pain but not suffering acute distress. Dr. Levine thereafter, on April 4, 2004, encouraged Plaintiff to lose weight and recommended a flax seed diet and exercise. (A.R. at 177, 179, 181.)

## B. PROCEDURAL HISTORY

On January 21, 2003, in the midst of these medical benchmarks, Plaintiff applied for both SSI and SSDI benefits. As indicated, Plaintiff claimed in his application to be suffering from pain and numbness in his back and legs, hand weakness, and obesity. (A.R. at 80–89.)

On June 17, 2003, Dr. Bruce Van Boeckel performed a consultative examination for the Commissioner. Dr. Van Boeckel opined that Plaintiff had lower back pain without neurological deficits and that he should be restricted from heavy lifting and repetitive bending. (A.R. at 151–52.)

On June 27, 2003, Dr. Rosemary Girgis, a state agency physician, completed a residual functional capacity ("RFC") assessment which found that Plaintiff was limited to lifting twenty pounds occasionally and ten pounds frequently. Dr. Girgis's also opined that Plaintiff could stand and walk for at least two hours and sit for about six hours in a work day. Dr. Girgis further determined that Plaintiff had limited push/pull capacities in his lower extremities, that he could occasionally perform postural movements, but that he needed to avoid concentrated exposure to temperature extremes, vibration and hazards. (A.R. at 153–60.)

On July 1, 2003, Plaintiff's SSI and SSDI applications were denied. Plaintiff's request for reconsideration was denied on October 20, 2003, following another RFC assessment dated October 12, 2003, this one by Dr. Gerald Chase, another state agency physician, who essentially concurred with Dr. Girgis. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (A.R. at 30–31, 39, 162–69.)

The hearing was held on December 8, 2004. Both Plaintiff and a vocational expert ("VE") testified. On January 28, 2005, the ALJ issued a decision denying benefits to Plaintiff. In large measure, the ALJ relied upon the consultative examination by Dr. Van Boeckel and the state agency assessments by Drs. Chase and Girgis. In essence, the ALJ concluded that Plaintiff's impairments, although severe, were not severe enough to prevent him from working as a hand packer, ticket seller or inspector.

Plaintiff appealed the ALJ's decision to the Appeals Council. On May 5, 2005, the Appeals Council declined to review the case, rendering the ALJ's decision final for present purposes. In due course, Plaintiff filed this appeal and the parties submitted the cross-motions currently at issue.

## III. DISCUSSION

An individual is entitled to SSDI benefits if, among other things, he has an insured status and, prior to the expiration of that status, was under a disability. *See* 42 U.S.C. § 423(a)(1)(A) and (D). SSI benefits, on the other hand, require a showing of both disability and financial need. *See* 42 U.S.C. § 1381a. Plaintiff's need for purposes of SSI and his insured status for purposes of SSDI are not challenged. The question here is whether Plaintiff suffers from a disability.

## A. DISABILITY STANDARD AND THE ALJ'S DECISION

An individual is considered disabled if he is unable to participate in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual is considered disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education,

and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B). *See generally Bowen v. Yuckert*, 482 U.S. 137, 146–49, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

In determining disability, the Commissioner follows a five-step protocol described by the First Circuit as follows:

First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1, Subpart P, Regulation No. 4. If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

. . . .

Fourth, . . . does the claimant's impairment prevent [him] from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir.1982).

In the instant case, the ALJ found as follows with respect to these questions: that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability (question one); that Plaintiff has impairments that are "severe," but which do not meet or medically equal one of the listed impairments in Appendix 1 (questions two and three); that Plaintiff is unable to perform any of his past relevant work (question four); but that Plaintiff has the residual functional capacity to perform a significant range of sedentary work (question five). (A.R. at 24.) As a result, the ALJ concluded, Plaintiff does not suffer from a disability.

### B. ANALYSIS OF PLAINTIFF'S CHALLENGE TO ALJ'S DECISION

Plaintiff summarizes his challenge to the ALJ's decision as "an objection to the way in which the ALJ evaluated [Plaintiff]'s credibility." (Plaintiff's Reply at 1.) The court, in large measure, agrees with Plaintiff's argument and, as a result, will remand the matter to the Commissioner for further proceedings.

#### 1. The ALJ's Credibility Determination

At the outset, it is necessary to describe the contours of the ALJ credibility determination. In summary, the ALJ concluded that Plaintiff retains the residual functional capacity for certain "sedentary work," *i.e.*, the ability to "lift and carry up to [ten] pounds frequently and occasionally, stand and walk each for two hours in an eight-hour workday, and sit six hours in an eight-hour workday, with the option to sit or stand as needed." (A.R. at 22.) To reach this conclusion, the ALJ discounted Plaintiff's credibility, particularly Plaintiff's testimony that, even when performing such sedentary work, he needed to walk around frequently, had to lie down

for a number of hours in an eight-hour period and could not reach. (See *id.*)

Were Plaintiff's testimony deemed credible, the VE apparently would have confirmed that Plaintiff was unable to perform any type of work found in the national economy and, thus, was disabled. (See *id.* at 262–63 (VE's testimony that no jobs would be available to a sedentary worker with a sit-stand option who needed to walk around every three to five minutes to "shake off numbness and pain from sitting too long"), 265 (VE's testimony that the need to "lay down for a number of hours during an eight-hour period ... clearly ... would be beyond what would be acceptable for any positions"), and 266 (VE's testimony that sedentary worker's limit of "only occasional extended forward or overhead reach" for "no more than a minute or two" would "clearly preclude the [previous] jobs that [the VE] had given").) As indicated, however, the ALJ stated that he did not find Plaintiff "credible ... to the extent alleged." (*Id.* at 22.)

### 2. *Analysis of ALJ's Credibility Determination*

The court begins with some basics on credibility, as summarized in a previous decision of this court:

> The First Circuit has long acknowledged that an administrative law judge is not required to take a claimant's subjective allegations at face value. *See Bianchi v. Sec'y of Health & Human Servs.*, 764 F.2d 44, 45 (1st Cir.1985) (citation omitted). Moreover, it is well established that a court must generally defer to credibility determinations made by an administrative law judge. *See Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir.1987); *Brown v. Sec'y of Health & Human Servs.*, 740 F.Supp. 28, 36 (D.Mass.1990). Nonetheless, a court must review an administra-

tive law judge's determination to see if it comports with the law. In essence, the court must ensure that an administrative law judge made specific findings to the "relevant evidence" when deciding to disbelieve a claimant. *See Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir.1986). *See also* Social Security Ruling (SSR) 96–7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Regs. 34, 483, 34, 485–86 (1996) (requiring that "[w]hen evaluating the credibility of an individual's statements, the adjudicator must ... give specific reasons for the weight given to the individual's statements"; and "the reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision").

*Arroyo v. Barnhart*, 295 F.Supp.2d 214, 223 (D.Mass.2003).

Here, the ALJ provided essentially two reasons for discounting Plaintiff's credibility. First, with regard to Plaintiff's subjective complaints of pain, the ALJ concluded "that the objective medical evidence [did] not support [Plaintiff]'s allegations." (A.R. at 22.) Second, the ALJ stated that Plaintiff's credibility was "undermined by the fact that, despite his doctors' advice that he needs to lose weight and stop smoking so he can have back surgery, he has not done either." (*Id.*) (citing *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir.1997)). The court examines each of these reasons in turn.

#### a. *Subjective Complaints of Pain*

The court finds the underpinnings for the ALJ's first credibility determination—that the objective medical evidence did not support Plaintiff's subjective complaints of pain—lacking. In *Da Rosa*, the First Circuit clarified that "in assessing [a claimant]'s subjective complaints and determin-

ing his residual functional capacity," the administrative law judge's analysis must be "consistent with the interpretive guidelines set forth in the POMS instructions." *Id.*, 803 F.2d at 26 (noting that "POMS" refers to the Program Operations Manual System, DI T00401.570, issued by the former Secretary of Health and Human Services on August 1, 1985). Those instructions are appended to the First Circuit's decision in *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19 (1st Cir.1986).

The POMS instructions speak directly to the issue here, *i.e.*, "[w]hen the claimant indicates that pain is a significant factor of his/her alleged inability to work, and the allegation is not supported by objective findings in the file." *Avery*, 797 F.2d at 28 (appendix). Faced with such a situation, an administrative law judge *"shall obtain* detailed descriptions of daily activities by directing *specific inquiries* about the pain and its effects to the claimant." *Id.* (emphasis added). It is "essential," the instructions continue, for the administrative law judge "to investigate *all avenues* presented that relate to subjective complaints, including the claimant's prior work record and information and observations by treating and examining physicians and third parties." *Id.* (emphasis added). Such information includes the following factors, typically referred to in this circuit as the *Avery* factors:

1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;

4. Treatment, other than medication, for relief of pain;

5. Functional restrictions; and

6. The claimant's daily activities.

*Id.* at 28–29. *See also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (further describing process for evaluating pain and other symptoms). "[I]n all cases in which pain is alleged," the instructions continue, "the determination rationale is to contain a thorough discussion and analysis of the objective medical and nonmedical evidence, including the individual's subjective complaints and the adjudicator's personal observations." *Avery*, 797 F.2d at 29.

In the instant case, the ALJ's credibility determination did not comport with the POMS instructions in general or the *Avery* factors in particular. The ALJ's findings on pain were hardly specific, detailed or complete. To be sure, the ALJ opined that certain of Plaintiff's pain medications are "generally designated ... for mild to moderate pain." The ALJ also noted Plaintiff's testimony that he needed to change positions and take "cat naps" during the day and had difficulty bending, using the stairs and sleeping at night. (A.R. at 21–22.) The ALJ, however, did not provide specific reasons for the weight he gave to Plaintiff's testimony or thoroughly analyze all of Plaintiff's medications, functional restrictions or daily activities, as *Avery* and the POMS instructions require.

Against this background, the court notes that the discogram in January of 2002 appears to corroborate Plaintiff's subjective complaints of pain. As the Commissioner concedes, " 'a discogram is a test to determine the anatomic source of low back pain for the patient.' " (Commissioner's Brief at 14 and n. 1 (quoting *Discogram to Diagnose Low Back Pain*, www.spine-health.com/topics/diag/diag08.html).) Granted, as the Commissioner states, the discogram itself causes pain. That, however, does not change the test's findings, that

Plaintiff's L4–5 and L5–S1 discs were "significant typical pain generators" in the range of "10" out of "10" for his L4–5 disc and "8" out of "10" for his L5–S1 disc. In short, Plaintiff's pain, as corroborated by the discogram, was improperly assessed. Accordingly, the court is inclined to order a remand for a more thorough review.

### b. *Plaintiff's Purported Failure to Lose Weight*

There is no question that the second basis for the ALJ's determination—that Plaintiff's credibility was "undermined by the fact that, despite his doctors' advice that he needs to lose weight and stop smoking so he can have back surgery, he has not done either"—is flawed, particularly with regard to Plaintiff's purported failure to lose weight. As a result, the court deems remand to be the only appropriate remedy.

As support for his reasoning, the ALJ cited an Eighth Circuit "smoking" decision that has nothing to do with obesity or losing weight. *See Kisling,* 105 F.3d at 1257 (implying that smoking is an impairment that is "controllable or amenable to treatment" and, therefore, upholding the denial of benefits to smoking plaintiff who suffered from respiratory problems). Obesity, as Plaintiff points out, must be evaluated pursuant to Social Security Ruling ("SSR") 02–01p, 2000 WL 628049, which took effect on September 12, 2002. Indeed, the ALJ's failure to even mention SSR 02–01p might alone justify remand. *See* 20 C.F.R. § 402.35(b)(1) (2005) ("Social Security Rulings ... are binding on all components of the Social Security Administration.").

SSR 02–01p recognizes that "obesity is a complex, chronic disease" and that "[t]reatment for obesity is often unsuccessful." *Id.,* 2000 WL 628049, at *2. Obesity, the ruling continues, is also a "risk factor that increases an individual's chances of developing impairments in most body systems"; "commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems"; and "may cause or contribute to mental impairments" and certain sleep disorders. *Id.,* at *3. *See also id.,* at *6 (obesity "can lead to drowsiness and lack of mental clarity during the day"). Until August 24, 1999, in fact, obesity was a listed impairment under step three of the sequential analysis and may still, by itself, "medically equal" a listing, thereby resulting in an automatic finding of disability. *See id.,* at **1, 5.

Unfortunately for Plaintiff, the ALJ took none of this into account. Instead, the ALJ discounted Plaintiff's credibility because, in his estimation, Plaintiff had not taken "his doctors' advice ... to lose weight." That, in the court's opinion, is too superficial an analysis. SSR 02–01p states that the Commissioner "will rarely use 'failure to follow prescribed treatment' for obesity to deny ... benefits." *See id.,* at *9. To deny benefits on such grounds, all of the following conditions must be met:

- The individual has an impairment(s) that meets the definition of disability, including the duration requirement, and

- A treating source has prescribed treatment that is clearly expected to restore the ability to engage in substantial gainful activity, and

- The evidence shows that the individual has failed to follow prescribed treatment without a good reason.

*Id.,* at *9. These conditions appear to be no less important when considering a claimant's credibility, as the ALJ attempted to do here. Yet not one of the conditions was adequately addressed.

As for the first condition, the ALJ did recognize Plaintiff's obesity as a "severe" impairment but apparently determined that it did not meet the definition of disability. Oddly, therefore, SSR–02–01p would appear to preclude the ALJ from even considering Plaintiff's purported failure to follow his doctors' advice. *See id.* ("Before failure to follow prescribed treatment for obesity can become an issue in a case, we must first find that the individual is disabled because of obesity or a combination of obesity.").

The second condition—the need for *prescribed* treatment—was not addressed at all. Pursuant to SSR 02–01p, treatment for obesity "must be *prescribed* by a treating source, ... not simply *recommended.*" *Id.* (emphasis added). "A treating source's statement that an individual 'should' lose weight or has 'been advised' to get more exercise," the ruling continues, "is not prescribed treatment." *Id.* Here, even if weight loss can be said to have been urged upon Plaintiff, (see, *e.g.,* A.R. at 188 (Dr. Rehman's July 6, 2000 note that he recommended that Plaintiff "try to lose weight"), 172 (Dr. Anderson's June 2002 opinion that Plaintiff "needs to consider an aggressive weight loss program" and suggesting gastric stapling), 171 (Dr. Anderson's October 15, 2002 opinion that Plaintiff "is in need of a lumbar fusion, but that can't be done [until] [h]e ... get[s] down to at least approximately 220 lbs") and 177 (Dr. Levine's April 4, 2004 note encouraging Plaintiff to lose weight and recommending a flax seed diet and exercise)), the particulars of those admonitions differ markedly from the reported obesity decisions cited by the Commissioner where treatment was prescribed. *Compare, e.g., Ramirez v.*

*Barnhart,* 292 F.3d 576, 581 (8th Cir.2002) (plaintiff neglected to take *prescribed* medication, refused to perform *prescribed* exercises and refused to see a dietician as *directed*); *Sias v. Secretary of Health & Human Servs.,* 861 F.2d 475, 480 (6th Cir.1988) (plaintiff refused to wear *prescribed* support hose or follow physician's other weight-loss *instructions*); *Wyrick v. Apfel,* 29 F.Supp.2d 693, 698 (M.D.N.C. 1998) (plaintiff failed and/or refused to follow *prescribed* treatment for losing weight). At least two other circuit court decisions cited by the Commissioner, both unpublished, are similarly distinguishable. *See Brown v. Barnhart,* 47 Fed.Appx. 864, 866–67 (10th Cir.2002) (unpublished) (administrative law judge must consider, *inter alia,* whether "weight loss ... was prescribed"); *Tuttle v. Barnhart,* 130 Fed. Appx. 60, 61–62 (8th Cir.2005) (unpublished) (discounting credibility of plaintiff who made no effort to follow *prescribed* treatment). To be sure, the court in *Tuttle* off-handedly remarked that the treatment was "recommended." *Id.* But it is clear that, unlike the case at bar, the treatment was actually *prescribed. See id.* (describing treatment as what the plaintiff was "directed" and "told to do" and citing court's previous "prescribed treatment" decision). *Cf. Walton v. Sec'y of Health & Human Servs.,* 1989 WL 43915, at *4 (6th Cir. May 3, 1989) (another unpublished case cited by the Commissioner, albeit one decided well prior to issuance of SSR 02–01p, which simply noted an administrative law judge's remark "that it did not enhance claimant's credibility that he had failed to heed advice to lose weight in the face of functional limitations exacerbated by obesity").[1]

---

1. It should be noted as well that each of the three circuit courts caution against citing their unpublished decisions. *See* Sixth Circuit Rule 28(g) ("Citation of unpublished decisions ... is disfavored."); Eighth Circuit Rule 28A(i) ("Unpublished opinions ... are not precedent and parties generally should not cite them."); Tenth Circuit Rule 36.3

Most importantly for purposes here, the third condition—which focuses on a claimant's reasons for not losing weight—was ignored by the ALJ. Even if the Commissioner finds "that a treating source has prescribed treatment for obesity, that the treatment is clearly expected to restore the ability to engage in [substantial gainful activity], and that the individual is not following the prescribed treatment," the Commissioner, according to SSR 02–01p, "must still consider whether the individual has a good reason for doing so." *Id.*, 2000 WL 628049, at *9. *See also Brown*, 47 Fed.Appx. at 866–67 (recognizing that administrative law judge "cannot use [the plaintiff's] failure to lose weight as a basis to judge her credibility without considering whether weight loss would restore her ability to work, was prescribed, or was refused without justifiable excuse"). SSR 02–01p also makes clear that the Commissioner "will not find that an individual has failed to follow prescribed treatment for obesity when the prescribed treatment is surgery" because of its risks and potential side-effects. *Id.* at 10. *See also id.* at *8 ("Obesity surgery modifies the stomach, the intestines, or both in order to reduce the amount of food that the individual can eat or the time food is available for digestion and absorption. Surgery is generally a last resort with individuals for whom other forms of treatment have failed. Some individuals also experience significant side effects from surgery (e.g., 'dumping syndrom'—that is, rapid emptying of the stomach's contents marked by various signs and symptoms).").

Here, the ALJ's analysis falls short in all respects. For one thing, there is no analysis as to why Plaintiff may not have followed his doctors' advice. At best, the record reveals that Plaintiff simply told Dr. Anderson on October 15, 2002, that he had "no idea" how to lose weight. Moreover, it appears that Dr. Anderson recommended nothing other than gastric stapling. Even had such surgery been "prescribed," it would not have been sufficient, standing alone, to satisfy the third condition set out in SSR 02–01p. This is all the more reason why a remand is necessary. *See also Celaya v. Halter*, 332 F.3d 1177, 1181 (9th Cir.2003) (remanding decision where administrative law judge failed to determine the effect of the plaintiff's "obesity upon her other impairments, and its effect upon her ability to work and general health, given the presence of those impairments").

### 3. *Summary*

Obesity is a complicated, chronic and often misunderstood disease which the Commissioner must scrutinize carefully pursuant to SSR 02–01p. Here, however, the ALJ engaged in no such analysis. He simply noted Plaintiff's purported "failure" to lose weight as a key factor in his credibility determination. Regrettably, this error was compounded by an incomplete analysis of Plaintiff's subjective complaints of pain.

### IV. CONCLUSION

For the reasons stated, the court ALLOWS Plaintiff's motion insofar as it seeks a remand and DENIES the Commissioner's motion to affirm. The matter is hereby remanded for further proceedings consistent with this opinion.

IT IS SO ORDERED.

("Citation of an unpublished decision is disfavored."). *See also* First Circuit Local Rule 32.3(b) (noting that citation to unpublished or non-precedential opinions of other courts is disfavored).